If it may please the Court, my name is John Potter, and I represent the Pangang Appellants in this matter. I'd ask the courtesy of reserving three minutes for rebuttal. At your clock. Thank you, Your Honor. Your Honor, the position of the Pangang Appellants is, I believe, straightforward and clear. Our position is that the District Court erred below by not applying the clear language of the Foreign Sovereign Immunities Act and running afoul of the express holding of Amarada Hess. And as part of this analysis, I'd like to walk through those two sources of authority, which to us are dispositive of this particular appeal. Obviously, the appeal starts with the Foreign Sovereign Immunities Act. And it really... Can I stop you right there? Because the threshold question to get into the Foreign Sovereign Immunities Act is to have foreign sovereigns. And what is your response to whether or not, if we take the allegations of the indictment as true, are all of the entities in question here covered in light of the Dole food case? Yes, Your Honor. And I think it would be important and instructive to walk through the sites for that purpose, to establish the applicability of Dole and how these particular defendants, all of these defendants, fall under Dole. So with respect to that, Your Honor, during the course of this litigation, there was consideration below as to whether or not these companies satisfied the definition of foreign instrumentalities under the act. And with respect to that, Your Honor, the defendants took the position in their motion asserting sovereign immunity that all parties were covered under the indictment and all were foreign instrumentalities under the act, based upon the allegations in the indictment itself. And the defendants took that position because, as alleged in the indictment, all of the defendants are foreign instrumentalities owned and controlled by the PRC government. And that appears at EOR 52, paragraph 18. And so that leads us to believe that all of the shares or a majority of the shares of each of these entities are owned by the government of China? Your Honor, it is a categorical statement by the government in the indictment that all of these companies are owned by the PRC. And I thought the indictment says that Panging Group is owned by the entity that is an agency of the PRC and that the other entities are owned by Panging Group. Am I misreading that? No, Your Honor. You're not misreading it. Actually, the indictment says both. So the indictment does allege that all of the defendants are owned and controlled by the PRC government. And the indictment further alleges that the Panging, as the clerk correctly noted, that the Panging Group was also a state-owned enterprise controlled by the SASAC. So with respect to the allegations in the indictment, Your Honor, it is true that there are additional allegations as relates to the Panging Group. But clearly, the indictment itself states that all of the defendants are foreign instrumentalities, that all of the defendants are owned by the PRC. There's language in the indictment to that effect. And under the Peterson case, the defendants had the right to rest upon the allegations in the indictment in asserting their status as foreign instrumentalities under the act. And Your Honor, what's significant is that not only that is what the defendants did in this case, they availed themselves of the indictment as they're entitled to do, because under Ninth Circuit law, if it appears from the face of an indictment that a party is a foreign instrumentality, a court is allowed to rely on that. And further, if it is uncontested that a party is a foreign instrumentality, that's another basis to establish that status. And Your Honor, in this particular case, it goes beyond merely it being uncontested that these parties were foreign instrumentality. The government admitted at the hearing in the court below that they were foreign instrumentalities under the Foreign Sovereign Immunities Act. And this is even applying Dole? Yes, Your Honor, well, Your Honor, the court imposed to the to the government at the hearing whether or not the dictates of Dole, they weren't asked specifically about Dole, but they were specifically in inquiry during the court below as to whether these particular entities were foreign instrumentalities under the FSIA. So the question was squarely put to the government on multiple occasions in the court below, and the court repeatedly reassured and represented to the court that they were foreign instrumentalities under the act. And with respect to those representations, Your Honor, I can certainly give the court the sites in the record. So the court has the benefit of these sites. Well, rather than doing that, could you just so Dole doesn't matter in this case at all? Oh, we're not saying, Your Honor, that Dole doesn't matter. Dole does matter. It's binding precedent. We respect Dole. What we're suggesting here, Your Honor, is that on this record, the face of the indictment establishes that all the defendants satisfy Dole in terms of the expressed language of the indictment. But on top of that, Your Honor, one step beyond that, there's both a waiver and a stopple argument because the government in this case conceded that these entities fell under the definition of foreign instrumentalities under the act. So based upon that record, there is ample support for the district court's conclusion that these parties were foreign instrumentalities. It's the combination of the of the language of the indictment, coupled with the express representations of the government below, that these parties were foreign instrumentalities under the act. All right. We spent seven minutes on that. I think it's important that we get to the key question. Sure, Your Honor, and look, the key question, I think, can be resolved simply in a very straightforward and almost linear fashion. Your Honor, the Foreign Sovereign Immunities Act makes crystal clear under section 1604 that foreign states and their instrumentalities are, shall be, immune from the courts of the United States and the state courts. There's no limitation in that provision limiting immunity merely to civil disputes. Secondly, there is a jurisdictional statute. Is there any other provision in the Foreign Sovereign Immunities Act that says a word about criminal procedure or criminal process or jurisdiction? Well, there isn't, Your Honor, and I think there are two observations with respect to the court's inquiry. There isn't, because the express terms of the statute cover the jurisdiction of the federal courts, which obviously subsume civil and criminal cases. There's no limitation in 1604. If Congress was interested in drafting a limitation to 1604, it certainly could have. It didn't. The words of the statute expressly cover courts. And courts obviously have jurisdiction over civil proceedings. And the other statute, Your Honor, is obviously the jurisdictional statute, which is 1330A. And with respect to that statute, both the statute and the cases recognize that the immunity and the jurisdictional provisions work in tandem. And with respect to the jurisdictional provisions, it, too, limits jurisdiction to civil cases. So when Congress saw fit to limit the extent and the scope of the act, the coverage of the act to civil cases, it certainly knew how to do it. And it did it with respect to jurisdiction. So is it your view, then, that the resulting system is one in which state-owned corporations, even airlines, oil companies, etc., are completely immune from all criminal process, state and federal, and commit crimes without fear of any consequence? Well, I wouldn't say without fear of any consequence. Well, maybe the individuals would, but the corporations, if I understand your position correctly, the corporations have passed criminally. Well, in terms of foreign relations, there are obviously sanctions that can be imposed upon the state. But, Your Honor, you're correct. Your assumption is correct. This is consistent with 250 years of common law in which, for years, and it's undisputed in the government's pleadings, that foreign states and their instrumentalities were immune from criminal prosecution. The FSIA codifies that approach. 1604, working in tandem with 1330, lays out a basis by which those entities are immune from criminal prosecution. And the other way we know this, Your Honor, is the court's opinion in Amarada Hess. Because in Amarada Hess, the court was grappling with an issue that's very similar to the issue presented to this court. In Amarada Hess, the party there was taking the position that another general jurisdictional statute gave rise to jurisdiction irrespective of the Foreign Sovereign Immunities Act. And the Supreme Court, of course, rejected this attempt to eviscerate and gut the Foreign Sovereign Immunities Act by relying on another general jurisdictional statute, saying explicitly that the Foreign Sovereign Immunities Act is the sole basis by which a party can assert jurisdiction over a foreign state or its instrumentality. That holding applies with equal force here. And under that holding, we respectfully submit the district court got this decision wrong by failing to recognize the clear language of the Foreign Sovereign Immunities Act and failing to follow the logic and holding of the Supreme Court in Amarada Hess. Your Honor, the other issue just to, I think, 30-some-odd seconds before my rebuttal time is that the exceptions don't apply here. And I think that that's a very important point for the court to appreciate. The exceptions don't apply because the exceptions apply expressly only through the jurisdictional statute, which is 1330, which recognizes that the exceptions apply as a basis for jurisdiction. So under the FSIA, the FSIA does recognize certain exceptions. There are exceptions by which jurisdiction can be asserted, but that only applies in the express terms of the statute for civil cases. And the other major mistake that the court made was to apply it in a criminal setting, which is not justified under the terms of the statute. But why wouldn't theft of trade secrets constitute commercial activity? Companies may be unlawful, but companies do do that to one another. We see such cases. Your Honor, Supreme Court precedent, the key here is the gravamen of the offense, what actually injured the party. And under that test, what this is all about is espionage. As the government concedes in its papers, espionage is the quintessentially sovereign activity. So this case is not about meetings or contracts. It's about a state-sponsored attempt to hack. But they didn't steal the secrets to throw them away or, you know, do something else with them. They stole them for commercial purposes. They wanted to develop the same product. Why isn't that a commercial purpose, a commercial activity? Your Honor, as alleged in the indictment, the purpose was to advance the national interests of the PRC. And fundamentally, Your Honor, this is not the type of activity that private parties engage in commonly in the marketplace. That's the test. Private parties do not commonly engage in espionage on the behest of another country. Your Honor, if I can reserve the remainder of my time, unless I have about a minute 22. Yes, you may. You may. Thank you, Mr. Yelovich. Good morning, and may it please the Court. Matthew Yelovich on behalf of the United States. The Foreign Sovereign Immunities Act does not immunize these defendants for three reasons. First, they are not foreign instrumentalities under Dole. Second, the Foreign Sovereign Immunities Act does not apply to criminal cases at all. And third, even if it does apply, the exceptions apply as well. And as the District Court correctly found below, two independent exceptions apply to defeat the immunity claim here. The commercial activity exception and waiver. Starting with this. So what about this? What about this argument that your indictment concedes that these companies are instrumentalities of a foreign power? Your Honor, the indictment does not concede that they are foreign instrumentalities under the FSIA. It alleges that they are foreign instrumentalities under the Economic Espionage Act. And I'd like to just make two quick points about Dole in relation to that. In Dole, the Supreme Court made clear that just alleging, just having a colloquial statement that something is state-owned. In that case, the parties agreed that it was true that Israel owned the subsidiary. But the question was, did Israel actually own 51% or more of the shares of the subsidiary? And there's nothing in the third superseding indictment to meet that burden, which is the defendant's burden to make a prima facie case that all four entities are 51% or greater owned directly by the People's Republic of China. In addition, Dole made clear that control doesn't matter. Again, corporate formalities matter. 51% or greater is the test. And so merely by pointing to allegations in the indictment that something is state-owned or controlled by the SASAC, which the indictment does allege, doesn't meet the burden that the defendants bear at the outset to establish that they're foreign instrumentalities under Dole. But what about Pangan Group? Doesn't the indictment say that Pangan Group is owned by SASAC or whatever that entity is? Yes, Your Honor. That paragraph four of the indictment does allege the lead defendant, the Pangan Group, is, quote, state-owned and is controlled by the SASAC, which is a political subdivision of the People's Republic of China, as alleged in the indictment. But under Dole, again, the Supreme Court rejected the idea that merely describing something as state-owned is sufficient, that the actual particulars of the share ownership matter. And in the corporate disclosure statement in the defendant's own brief, in the opening brief in this case, the share ownership is described for all four entities, and none of the four entities are described as being majority-owned directly by the People's Republic of China or by a political subdivision of the People's Republic of China. And so they cannot meet their burden to make that prima facie case that they are foreign instrumentalities able to invoke the act. But even if they could meet that burden, of course, the Foreign Sovereign Immunities Act doesn't apply to criminal cases. Every court in a criminal case to have decided that question has held the same, and those decisions are all correct looking at the text, history, and background of the statute. Starting with the text, as the Supreme Court laid out in Sumantra v. Yusuf, when evaluating claims of immunity under the Foreign Sovereign Immunities Act, we look to the text as a whole, not to isolated textual provisions that may give rise to a literally possible immunity claim. And in this case, looking at the text as a whole, you can see that there's not a single word about criminal cases in this entire act. And in fact, there are textual indication after textual indication indicating that the act was meant to apply exclusively to civil cases. Starting with the very mechanism by which states can assert immunity, those mechanisms are purely civil. The removal provision in section 1441D and the answering provision in section 1608D, those describe civil procedure mechanisms by which a state can assert immunity. It is anomalous that Congress would have passed a sweeping bill to eliminate, to displace the executive's authority in criminal cases and provide blanket immunity for foreign state-owned companies to commit crimes in the United States without even providing them a mechanism by which to assert that immunity. Moreover, the act in detail discusses various kinds of civil cases, including mortgage foreclosure claims and... How about the Emirati cascade? Does that help the defendants any? No, Your Honor. As the D.C. Circuit observed last year in answering a very similar question to the one presented here in the In re Grand Jury subpoena case, the briefest peek under the hood of Amarada Hess, as the D.C. Circuit said, shows that Amarada Hess was not about this question at all. And in fact, Amarada Hess specifically held that Congress need not have amended all of the grants of jurisdiction in Title 28. That's the words of the Amarada Hess opinion, in order to effectuate the purposes of the Foreign Sovereign Immunities Act. But no one briefed, argued, or decided criminal jurisdiction in that case. It simply wasn't a part of the case at all. And so to read Amarada Hess as creating some blanket immunity for criminal defendants is simply not consistent with that decision. In addition to that, as the Supreme Court said in Sumatra v. Yusuf, what Amarada Hess stands for is if the FSIA applies, it is the sole basis by which to hail a foreign sovereign into United States courts. And that's the key language from Sumatra, if it applies. And then the quote from Amarada Hess. And so to merely quote Amarada Hess in saying that it's the sole basis, I think ignores the later decisions of the Supreme Court and ignores the issues that were actually before the court in that case. Mr. Yelovich, if we were to decide that the FSIA does not apply to criminal prosecutions, would that strip panging of all claims to immunity? Would it strip the lead defendant of all claims to immunity? I seem to have lost the audio feed from Judge Wardlaw for a moment. Sam, we seem to have a problem with Judge Wardlaw's feed. All right. So what we're going to do to resolve the technical issue is take a recess now for about somewhere between 15 and 30 minutes. So if counsel could stand by, we will get Judge Wardlaw back onto the video connection, and then we'll be able to resume the argument where we left off and then proceed with the rest of the calendar. So we will see you again. So please stand by. Don't maintain your connections. And Sam will let you know when we're ready to reassemble. I thank you for your patience. We these are sometimes challenging from a technological point of view. It's gone relatively well, but things like this do occasionally happen. So we will reconvene as soon as we're able. Stand by and Sam will let you know. Thank you, counsel. Right. I want to thank counsel for putting up with my technological difficulties. I apologize for the interruption of our discussion here. We left off when I was in the middle of a question to Mr. Yelovich, and the question was, assuming that we were to hold that Foreign Sovereign Immunities Act does not apply to criminal proceedings. What principles would we adhere to in determining hanging group enjoyed any sovereign immunity in this area? Would we return to the pre-tapped letter common law principles that reigned before FSIA was enacted? Yes, your honor. I think we would return to the common law that existed outside of the FSIA, that still exists outside of the FSIA. As the Supreme Court in Sumatra made clear, when the FSIA doesn't apply, the executive still retains its common law authority to issue suggestions of immunity. And for example, if the FSIA did not apply to criminal cases, the executive could issue a suggestion in a state criminal case that it would view as binding on that court. If, for example, some of the consequences that my friend representing the defendants points out in his brief in terms of state prosecutions. And so for those reasons, if the FSIA doesn't apply, the executive's traditional role is not displaced. And therefore, the common rules of immunity that existed prior to the FSIA would still apply as they always have in this realm. And I just want to touch on two further things about the FSIA and then a quick jurisdictional point if I have time. But I'm happy to continue answering questions on the common law issue. The two points on the FSIA's applicability to this case, in addition to the text, the procedural mechanisms I talked about, and all the textual indicators in the act that it was meant to apply exclusively to civil cases. If you also look at the purpose as Congress outlined in section 1602, and then to the extent you find it persuasive, the legislative history, there's not a whisper in the legislative history about this act being, applying to criminal cases that Congress had criminal cases at all on its mind when it was passing the act. And as one scholar put it, and it's quoted by the D.C. Circuit, Congress instead was laser focused on civil cases when passing this legislation. And that makes sense in light of the background of need for the legislation. This act passed in some part at the urging of the executive to extricate the executive branch from being dragged in unwillingly to civil litigation where it was often in politically difficult positions as to whether immunity should apply or not. And to read that background in the absence of any legislative history or textual indication that it was meant to apply to criminal cases, to read that background as the executive willingly giving up its traditional role in criminal cases is just turning the background of this legislation on its head. And so the government contends that this act does not apply to criminal cases. But even if it does apply, the district court was clearly correct in concluding that the commercial activity exception and the waiver exception apply to defeat these defendants' immunity claim. Here, this case falls right within the heart of the commercial activity exception. There are $27 million of contracts to steal trade secrets from DuPont in order to make— The commercial activity exception says that it applies in any case in which the action is based upon a commercial activity. Do we normally refer to a criminal prosecution as an action, or is that a term that signifies a civil case? It does signify a civil case, Your Honor, which is yet another textual clue that this act doesn't apply to criminal cases at all. Consistent with all of the other indications in the act where it discusses criminal actions or litigants or other references to private parties, this act was not designed to apply to criminal cases, but to the extent it does apply, the exceptions apply in, quote, any case. And based on that text, the— No, but I just read it's not any case. It's not any case based on a commercial activity. It's any case in which the action is based upon commercial activity. And if action is a civil action, then the case has to be a civil action to fall within the commercial exception. Am I reading this incorrectly? Well, I would just disagree with your reading, Your Honor, not that you're reading it incorrectly in terms of what the words say. The import of that is that, first of all, it's yet another indication that the act overall is meant to apply only to civil cases. But if we're in the world of assuming it applies to criminal cases at all, which, again, there's no textual indication it does, but if we are assuming it does apply, then all of those terms, such as action that might— or litigants in other parts of the act that might ordinarily only refer to civil cases would also apply to criminal ones because we're assuming that the act applies in criminal cases when otherwise there's no indication it does. And so if that is the case, again, other parts of the act refer specifically to civil actions. So to the extent that the question is whether action can ever mean a criminal case, Congress knew how to say civil action in other parts of the act and did so and didn't so limit it here. But I think that as the D.C. Circuit persuasively pointed out in the NRA grand jury subpoena case, reading the text of this statute as a whole, it's clear that even assuming it applies to criminal cases, the exceptions would have to apply as well. And under that reading, the commercial activity exception would defeat the defendant's claim of immunity here because of the contractual the actions based on contracts, $27 million of contracts, voluminous financial transactions throughout the San Francisco Bay Area that are alleged in furtherance of the conspiracy and attempt, and employee travel for business meetings in the United States, including employee travel carrying the very trade secrets that are at the heart of this matter. And so for all of those reasons, the district court correctly found that the commercial activity exception applies. And in addition to that, the waiver provision also applies. The district court was in a good position, having observed this case for nearly nine years, to know the totality of the litigation conduct and the extensive participation of the defendants in this litigation. And the district court did not abuse its discretion in concluding that the totality of that litigation participation without ever mentioning immunity constituted an applied waiver. And indeed, the defendants affirmatively invoked the court's power to give the defendants things that they wanted, like a bill of particulars that went to the merits, or to litigate discovery disputes over the very discovery related to the very trade secrets that they are alleged to have conspired and attempted to steal. And so to allow them to strategically use the court and invoke its power to get the things that they wanted before ever telling the court that, in fact, the court had no jurisdiction over them would reward a kind of gamesmanship that I think the act was not designed to reward. I see that my time is running out. Obviously, the government believes that there is no jurisdiction to reach any of those merits because of the ripeness issue and the collateral order doctrine. And I'm happy to answer questions on that as well. Thank you. Thank you, counsel. Mr. Potter. Mr. Potter, we're not seeing your face. There you go. Oh, can you see me now? Yes. Yes. Okay. And I'm actually not seeing a clock. Oh, well, the clock is should be giving you one minute and 25 seconds. And it has one minute. Okay. Bonnie, can you add some time onto that? I'm trying to do that right now, Judge. A technical issue. Mr. Potter, why don't you proceed? And we'll give you that extra time. Thank you, Your Honor. Your Honor, just to go over these points rapid fire, because I think they're all important with respect to Dole and the Foreign Sovereign Immunities Act and whether these entities are foreign instrumentality on appeal. The government is claiming that they're not foreign instrumentalities under the act. And the court below at SCR 346. They took the different positions saying that there were instrumentalities under the act. What about your corporate disclosure statement, which you pointed to? The corporate disclosure statement tells us who owns the shares. And it's not the government of China or a subdivision of the government of China. It's another corporation. And isn't that exactly what Dole says? These grandchildren corporations are not covered? Your Honor, that was actually pointing to my second point. My second point is this. Under Dole, the determination is reached at the time of the indictment, not later in time. So at the time of the indictment, these entities were, as alleged in the indictment, owned by the PRC. So the corporate disclosure statement is irrelevant to the analysis under Dole. So you're saying that the Angan Group acquired Pangan Group Company stock after the indictment? I don't know that that is in the record, Your Honor. But what is in the record is that at the time of the indictment, the government made the allegations that these were all owned by the PRC. And on that basis, we are foreign instrumentalities under Dole. Because it's determined by the time of the indictment. You made a temporal claim. And so I want to know if there's a negative pregnant in there. Are you saying that they did not own this company at the time of the indictment when you said that at the time you filed your briefs that they did? Your Honor, at the time the brief was filed, that was the status as represented in the brief. What's not in the record is to when that occurred. One way or the other. One final point, Your Honor, with respect to this whole structure with the FSIA and to go on a quick history tour. In 1812, the United States recognized immunity under the common law against criminal prosecution that remained in place through 1952 in the Tate letter. When the Tate letter was issued in 1952, it was limited to commercial activity. And we know that because in world arrangements, which came after the Tate letter, the court found immunity for a business, a foreign owned business, pursuant to common law. What ultimately transpires is in 1976, when the Foreign Sovereign Immunities Act is passed, Congress was addressing some of the problems associated with the administration and the implementation of the principles of the Tate letter as they related to commercial activity in a civil setting. So the fact that there's nothing in the legislative history addressing criminal prosecutions is because, as counsel correctly pointed, the point of the Foreign Sovereign Immunities Act was to address some of the shortcomings and problems associated with implementing the dictates of the Tate letter. And that was sort of the focus of Congress. And I would add, though, before we even go there, just as a reminder to the court, as the court well knows... Counsel, you're well exceeding your time. I'm pretty sure we're aware of the history. You can just sum up. Just to sum up, Your Honor, at the end of the day, Your Honor, the express terms of the statute control in a statute's clearance phase, there's no need to consult with the legislative history. I thank the court for the indulgence of a few extra minutes or seconds. Thank you. Thank you both, counsel. And again, I personally appreciate your working around our technical difficulties. United States v. Penning Group is submitted. And we will next hear Olson v. the Department of Defense.
judges: Wardlaw, Eaton, Collins